FILED ___ ENTERED
___ LOGGED ___ RECEIVED

JUN 18 2013

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY




## ATTACHMENT A: STATEMENT OF FACTS – ANTHONY L. WRIGHT

*If the case had proceeded to trial, the Government would have proven the following facts beyond a reasonable doubt. This statement of facts does not constitute all of the facts provable by the Government.*

As described in greater detail below, on or about May 29, 2009, in the District of Maryland and elsewhere, **ANTHONY L. WRIGHT ("WRIGHT")**, a resident of Bowie, Maryland, made a statement to the Small Business Administration ("SBA"), knowing it to be false, for the purpose of influencing in any way the action of the SBA, by submitting an 8(a) Annual Update form on behalf of Platinum One Contracting, Inc. ("Platinum One") for the purpose of continuing the company's participation in the SBA's Section 8(a) program. In the application, **WRIGHT** certified that Platinum One was controlled by a socially and economically disadvantaged individual who set the company's strategic policy and managed its daily business operations, when he then and there well knew, Platinum One was controlled by an individual who was not socially and economically disadvantaged, in violation of 15 U.S.C. § 645(a).

Capitol Contractors, Inc. ("Capitol Contractors") was a Maryland corporation with its headquarters in Edgewater, Maryland and previously in Capitol Heights, Maryland. Capitol Contractors provided roofing and construction services, primarily to departments and agencies of the United States government. On March 3, 1993, the Small Business Administration ("SBA") certified Capitol Contractors to participate in its Section 8(a) Business Development Program, which provided business development assistance to socially and economically disadvantaged small businesses, including access to government contracts reserved for participants in the Section 8(a) Program. To participate in the Section 8(a) Program, among other eligibility requirements, a small business needed to be owned and controlled by a socially and economically disadvantaged individual. Certain individuals, including African-Americans and Native Americans, were presumed to be socially disadvantaged.

The majority of Capitol Contractors's revenue came from government contracts obtained through the Section 8(a) Program. A small business, however, could only participate in the Section 8(a) Program for nine years before it "graduated" from the program and was no longer eligible to obtain government contracts reserved for Section 8(a) Program participants. Capitol Contractors graduated from the Section 8(a) Program on March 3, 2002.

Shortly after Capitol Contractors graduated from the Section 8(a) Program, the majority owner of Capitol Contractors, who was a Native American, sold his interest in the company to VJS who had owned less than half of the company while it participated in the Section 8(a) program. At that point, VJS, who did not qualify as a socially and economically disadvantaged individual pursuant to the Section 8(a) program, became sole owner of Capitol Contractors and operated the company on a day-to-day basis. Capitol Contractors graduated from the Section 8(a) program in March 2002.

In or about 1999, VJS asked **WRIGHT**, an African-American employed at Capitol Contractors as a roofer and then a project manager, to form a new company to participate in the

Section 8(a) program upon Capitol Contractors's graduation from the program. Accordingly, on or about August 11, 1999, **WRIGHT** incorporated Platinum One in Maryland with **WRIGHT** becoming president and a sixty percent owner while a relative of VJS became vice president and forty percent owner. However, in reality, neither **WRIGHT** nor VJS's relative controlled Platinum One's operations.

**WRIGHT** did not control either the day-to-day management nor the long- term decision making for Platinum. Specifically, **WRIGHT** did not approve the hiring or firing of Platinum personnel, including managers. **WRIGHT** did not decide how much Platinum employees would be paid. **WRIGHT** did not decide on which projects that Platinum would bid. **WRIGHT** had no role in the preparation of Platinum's bids or in the negotiation of the contracts. **WRIGHT** had no role in Platinum's financial operations. **WRIGHT** did not decide which equipment would be purchased for Platinum's operations. **WRIGHT** had no role in Platinum's bonding operations. **WRIGHT** did not participate in obtaining insurance for Platinum. **WRIGHT** did not decide upon the subcontractors Platinum would use. **WRIGHT** did not approve Platinum employee's leave. **WRIGHT** did not decide where Platinum's offices were located, or how much the company paid in rent. **WRIGHT** did not direct the daily work activities of Platinum's employees, except for the roofers he supervised. Instead, VJS exercised undisclosed control over the company's operations. At first, VJS would direct **WRIGHT** to sign certain documents related to Platinum. Eventually, VJS had a signature stamp prepared with **WRIGHT's** signature and would use that stamp to sign documents and control the company. VJS controlled Platinum from the outset, and directed **WRIGHT** to sign fraudulent documents to deceive the SBA regarding the company's operations, and to allow VJS to exercise complete control over Platinum. **WRIGHT** knew the documents he signed and submitted to the SBA regarding his role at Platinum were false.

Between August 1999 and March 2002, Capitol Contractors "subcontracted" work to Platinum One for the specific purpose of building a track record so that Platinum One could produce past performance references to the SBA in order to gain entrance into the Section 8(a) Program. In reality, Platinum One used Capitol Contractors's employees and equipment to perform the subcontracting jobs.

Equipped with a track record built through "subcontracting" from Capitol Contractors, on or about March 18, 2002, Platinum One submitted an application to the SBA for certification as a participant in the Section 8(a) Program. The application was signed by **WRIGHT** who attested to its truth and accuracy. The application, however, was false in that it concealed from the SBA that VJS exercised control over the company; that VJS had previously supervised **WRIGHT** at Capitol Contractors; and that VJS owned more than 10% of Capitol Contractors and was related to an owner of Platinum One. After receiving this false application, the SBA accepted Platinum One into the Section 8(a) Program on or about April 29, 2002.

From in or about May 2004 through in or about April 2010, Platinum One submitted to

the SBA 8(a) Annual Update forms which were signed by **WRIGHT**. **WRIGHT** made several false statements in each of these annual update forms. First, even though VJS controlled Platinum One, the 8(a) Annual Update forms falsely certified that Platinum One was controlled by a socially and economically disadvantaged individual who set the company's strategic policy and managed its daily business operations. Second, the forms falsely certified that **WRIGHT** had not been formerly employed by any non-disadvantaged member of Platinum One's management, despite the fact that **WRIGHT** had worked for VJS at Capitol Contractors. Third, the forms falsely certified that no non-disadvantaged individual member of Platinum One's management received compensation in any form as director, officer or employee that exceeded that received by **WRIGHT**. In reality, Platinum's payments to VJS and other corporate officers exceeded its payments to **WRIGHT** for each year from 2004 through 2009. Fourth, the forms stated that Platinum One provided records of all payments by the company to its officers. Although VJS held the title senior vice president, Platinum One did not provide a record of millions of dollars that it paid directly and indirectly to him. Finally, the forms concealed that VJS had guaranteed bank loans to Platinum One.

From in or about October 2003 through in or about March 2010, **WRIGHT** and VJS caused Platinum One to enter into the following contracts with federal agencies pursuant to the SBA's Section 8(a) program even though Platinum One was not eligible to obtain contracts under that program. As a result of these contracts, Platinum One received payments of more than $52 million.

| Contracting Agency | Partial Contract Number | Contract Date | Total Payments to Platinum One |
|---|---|---|---|
| SSA | 460003 | 10/10/2003 | $2,696,347 |
| GSA | XC0017 | 5/13/2004 | $1,875,472 |
| NPS | 40036 | 7/7/2004 | $260,881 |
| GSA | TD0210 | 7/26/2004 | $996,224 |
| DoD | 5D0001 | 10/1/2004 | $382,030 |
| GSA | XC0026 | 10/27/2004 | $911,832 |
| GSA | XD0009 | 8/1/2005 | $1,066,521 |
| NPS | 50029 | 8/29/2005 | $659,603 |
| NPS | 50035 | 8/29/2005 | $195,936 |
| SSA | 660006 | 10/10/2005 | $3,840,608 |
| NPS | 60006 | 1/24/2006 | $39,065 |
| GSA | DC0004 | 4/4/2006 | $759,098 |
| NPS | 60033 | 7/5/2006 | $17,823 |
| NPS | 60037 | 8/28/2006 | $135,000 |
| GSA | XC3001 | 9/12/2006 | $249,982 |

| Agency | ID | Date | Amount |
|---|---|---|---|
| DoD | 6P0361 | 9/30/2006 | $20,143 |
| DoD | 6P0366 | 9/30/2006 | $9,832 |
| DoD | 6P0367 | 9/30/2006 | $50,749 |
| DoD | 6P0368 | 9/30/2006 | $4,838 |
| DoD | 6P0369 | 9/30/2006 | $9,988 |
| DoD | 6P0370 | 9/30/2006 | $56,265 |
| DoD | 6P0371 | 9/30/2006 | $17,794 |
| NPS | 70018 | 3/12/2007 | $285,551 |
| NIST | SE0349 | 3/13/2007 | $21,436 |
| GSA | XC0021 | 3/14/2007 | $227,626 |
| GSA | XC0017 | 3/14/2007 | $541,127 |
| GSA | XC0014 | 3/23/2007 | $1,099,417 |
| NIST | CN0024 | 6/1/2007 | $271,205 |
| NPS | 60042 | 8/13/2007 | $19,648 |
| NPS | 70042 | 8/13/2007 | $296,168 |
| NPS | 70048 | 8/24/2007 | $285,807 |
| NIST | CQ0013 | 8/28/2007 | $1,119,855 |
| GSA | WM0104 | 8/29/2007 | $30,337 |
| DoD | 8D0001 | 12/31/2007 | $585,767 |
| DoD | 8D0304 | 2/29/2008 | $18,524,580 |
| DoD | 8D0002 | 3/6/2008 | $5,029,337 |
| GSA | XC0030 | 5/29/2008 | $294,963 |
| GSA | XC0043 | 8/27/2008 | $428,932 |
| NPS | 80044 | 9/16/2008 | $221,543 |
| DoD | 8D0006 | 9/19/2008 | $3,592,651 |
| NPS | 80055 | 9/24/2008 | $303,028 |
| NPS | 80066 | 9/24/2008 | $105,542 |
| NIST | CN0055 | 9/24/2008 | $46,800.03 |
| GSA | XC0023 | 9/30/2008 | $1,227,187 |
| GSA | DC0030 | 1/5/2009 | $114,300 |
| GSA | XC0004 | 2/10/2009 | $1,037,710 |
| SSA | 960031 | 4/30/2009 | $1,299,196 |
| NPS | 90473 | 8/4/2009 | $30,279 |
| GSA | XC0016 | 3/13/2010 | $1,683,746 |

VJS and his wife, who was in charge of Platinum One's accounting, transferred millions of dollars from Platinum One to bank accounts in their own names, to casinos on their own behalf, to Capitol Contracting and another company owned by VJS, and to credit card companies to pay for personal expenses that VJS and his wife charged to Platinum One's corporate credit cards.

In early 2009, the SBA had proposed that Platinum be debarred from receiving federal government contracts. In response to this proposed debarment, **WRIGHT** signed a letter to the SBA dated February 12, 2009, under penalty of perjury. In this letter, **WRIGHT** falsely claimed that he controlled both the "day-to-day management" and the "long-term decision making" for Platinum. **WRIGHT** claimed that his responsibilities included "Subcontracting, as appropriate"; "Purchase of materials and equipment from suppliers and vendors"; "Contract performance, including negotiations of changes, participation in meetings with project owners to discuss performance, payment and job progress"; "Pay application review and approval"; "Hiring and firing of personnel"; "Oversight of preparation and submission of invoices/requisitions" and "Meetings with owners to resolve project disputes". **WRIGHT** further stated that management responsibilities not principally handled by him were handled by the other owner of the company. These statements were false because **WRIGHT** did not perform these functions for Platinum and management responsibilities were principally handled by VJS rather than by **WRIGHT** or the other owner. **WRIGHT** knew these statements were false when he signed the letter and made these statements for the purpose of influencing the actions of the SBA.

In the fall of 2010, **WRIGHT** sold his interest in Platinum One for a total of $250,000. In October 2010, VJS provided **WRIGHT** with a $240,000 check drawn on Platinum One's bank account. **WRIGHT** subsequently received another $10,000 for selling his interest in the company. VJS caused his relative to receive Wright's interest in Platinum One, resulting in his relative being the sole nominal owner of Platinum One.

I have read this statement of facts, and have carefully reviewed it with my attorney. I acknowledge that it is true and correct.

_____    _____6-18-13_____
Anthony L. Wright                                Date

11